UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

JANET L.,[1]                                    )
                                               )
                    Plaintiff,                 )
                                               )
        v.                                     )        No. 1:20-cv-01685-SEB-DML
                                               )
KILOLO KIJAKAZI, Acting Commissioner of the    )
Social Security Administration,[2]             )
                                               )
                    Defendant.                 )

## **ORDER**

        Plaintiff Janet L. ("Janet") has appealed the final decision of the Commissioner

("Commissioner") of the Social Security Administration ("SSA") denying her December

16, 2009, application for disability insurance benefits ("DIB"), alleging a disability onset

date of May 5, 2008.  R. (Dkt. 13) at 17.  The application was initially denied on March

3, 2010, R. at 73, and upon reconsideration on April 21, 2010.  R. at 83.  An

administrative law judge conducted a hearing on January 27, 2011, R. at 32, resulting in a

decision on February 14, 2011, that Janet was not disabled and thus not entitled to receive

DIB.  R. at 14.  The Appeals Council denied review on March 23, 2012.  R. at 6.

---

[1] To protect the privacy interests of claimants for Social Security benefits, consistent with the
recommendation of the Court Administration and Case Management Committee of the
Administrative Office of the United States courts, the Southern District of Indiana has opted to use
only the first name and last initial of non-governmental parties in its Social Security judicial review
opinions.

[2] According to Federal Rule of Civil Procedure 25(d), after the removal of Andrew M. Saul from his
office as Commissioner of the SSA on July 9, 2021, Kilolo Kijakazi automatically became the
Defendant in this case when she was named as the Acting Commissioner of the SSA.

Following a complaint seeking judicial review, a district judge remanded the case for further proceedings on September 20, 2013.  R. at 673.

A second administrative law judge conducted a hearing on October 3, 2014, R. at 647, and a supplemental hearing on April 9, 2015, R. at 608, resulting in a decision on December 17, 2015, that Janet was not disabled and thus not entitled to receive DIB.  R. at 568.  On September 29, 2016, a district judge granted the parties' joint motion to remand the case for further administrative proceedings.  R. at 2236.  On November 2, 2016, an Appeals Council order gave the administrative law judge the discretion to consolidate the DIB claim with a subsequent application for supplemental security income ("SSI") that was filed by Janet on June 9, 2016, and initially denied on September 12, 2016.  R. at 2241.  The second administrative law judge conducted a hearing on August 9, 2017, R. at 2131, and a supplemental hearing on January 4, 2018.  R. at 2148. On May 2, 2018, the administrative law judge issued a partially favorable decision for the consolidated DIB and SSI claims.  R. at 2093; 2097-98.  The administrative law judge determined that Janet was not disabled on or before her date last insured ("DLI"),[3] December 31, 2013, and thus not entitled to DIB, but was disabled beginning May 15, 2016, and thus entitled to SSI.  R. at 2116.  On April 8, 2019, a district judge granted the parties' joint motion to remand for further proceedings.  R. at 3057.  On July 5, 2019, an Appeals Council order affirmed the administrative law judge's finding that Janet was

---

[3] Janet must prove the onset of disability on or before her DLI, the date that she last met the insured status requirements of the Social Security Act, to be eligible for DIB.  *See Shideler v. Astrue*, 688 F.3d 308, 311 (7th Cir. 2012); *see also* 20 C.F.R. § 404.131.

disabled as of May 15, 2016, but vacated the administrative law judge's decision pursuant to the District Court order for the period prior to that date.  R. at 3059; 3061.

A third administrative law judge (the "ALJ") conducted a hearing on December 9, 2019, R. at 2965, and a supplemental hearing on January 29, 2020, R. at 2999, resulting in a decision on February 21, 2020, that Janet was not entitled to receive DIB.  R. at 2919.  Janet chose not to file written exceptions to the ALJ's decision, and the Appeals Council did not assume jurisdiction of the case, which made the ALJ's decision the final decision of the Commissioner effective April 22, 2020.  Dkt. 1 at 2; *see* R. at 2920 (ALJ's decision becomes final 61 days after the notice of decision); *see also* 20 C.F.R. § 404.985(d).

On June 19, 2020, Janet timely filed this civil action seeking judicial review of the decision pursuant to 42 U.S.C. § 405(g).  Dkt. 1.

For the reasons below, the decision is remanded.

## **Background**[4]

The ALJ followed the five-step sequential evaluation set forth by the SSA, *see* 20 C.F.R. § 404.1520(a)(4)(i) to (v), in concluding that Janet was not entitled to DIB.  R. at 2948.  Specifically, the ALJ found as follows:

- Janet's DLI remained December 31, 2013.  R. at 2925; *see supra* note 3.  The ALJ's subsequent findings considered the period at issue beginning with Janet's alleged onset date, May 5, 2008, through her DLI.  *See, e.g.*, *id.*

---

[4] The discussion of Janet's medical history and treatment includes sensitive and otherwise confidential medical information that has been thoroughly detailed in the ALJ's decision and the parties' respective briefs.  To the extent possible, we detail here specific facts only as necessary to address the parties' arguments.

- At Step One, Janet had not engaged in substantial gainful activity[5] during the period at issue.  *Id*.

- At Step Two, she "had the following severe impairments: obesity; degenerative disc disease of the cervical and lumbar spine; fibromyalgia; diabetes mellitus; obstructive sleep apnea (OSA); and chronic obstructive pulmonary disease (COPD)."  *Id.* (citation omitted).

- At Step Three, she did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments.  R. at 2931.

- After Step Three but before Step Four, Janet had the residual functional capacity ("RFC") "to perform sedentary work as defined in 20 CFR 404.1567(a) except that the claimant was further limited to no more than occasionally climbing ramps or stairs; never climbing ladders, ropes, or scaffolds; no more than occasionally balancing, stooping, kneeling, crouching, or crawling; no more than frequently reaching, handling, fingering, or feeling; no more than occasionally being exposed to extreme heat, extreme cold, wetness, humidity, vibration, pulmonary irritants (including dust, fumes, and odors), or workplace hazards (including unprotected heights, moving mechanical parts, and operating motor vehicles); understanding, remembering, and carrying out no more than simple instructions; making no than simple, work-related decisions; tolerating no more than rare changes in a routine work setting; no more than occasionally interacting with supervisors or coworkers, and brief, superficial contact with the public; and being able to work in proximity to others but never performing shared or tandem tasks."  R. at 2934.

- At Step Four, relying on the testimony of a vocational expert during the January 2018 hearing and considering Janet's RFC, she was incapable of performing her past relevant work as an internal auditor.  R. at 2944.

- At Step Five, relying on the testimony of the vocational expert who testified during the January 2020 hearing (the "VE") and in light of Janet's age (47 years of age on her DLI), education (at least a high school graduate), work experience, and RFC, there were jobs that existed in significant numbers in the national economy that she could have performed in representative occupations, such as a semi-conductor bonder and circuit board screener.  R. at 2944-45.

---

[5] Substantial gainful activity is defined as work activity that is both substantial (*i.e.*, involves significant physical or mental activities) and gainful (*i.e.*, work that is usually done for pay or profit, whether or not a profit is realized).  20 C.F.R. § 404.1572(a).

## Standard of Review

Upon review of the Commissioner's decision,

> [w]e will uphold [it] if it applies the correct legal standard and is supported by substantial evidence. *Castile v. Astrue,* 617 F.3d 923, 926 (7th Cir. 2010). Substantial evidence is "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id.* (quoting *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007)). A decision denying benefits need not discuss every piece of evidence, but if it lacks an adequate discussion of the issues, it will be remanded. *Villano v. Astrue,* 556 F.3d 558, 562 (7th Cir. 2009). Our review is limited to the reasons articulated by the ALJ in her decision. *Larson v. Astrue,* 615 F.3d 744, 749 (7th Cir. 2010).

*Campbell v. Astrue*, 627 F.3d 299, 306 (7th Cir. 2010). In determining whether the decision was properly supported, we neither reweigh the evidence nor assess the credibility of witness, nor substitute our judgment for the Commissioner's. *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003).

## Analysis

Janet presents three issues for review: whether (1) the ALJ's Step Five determination is unsupported by substantial evidence, (2) the ALJ's subjective symptom evaluation is flawed, and (3) the ALJ's RFC finding is unsupported by substantial evidence. Janet requests an award of benefits. We will address these issues as necessary to resolve the appeal below:

### Case History

Our analysis of Janet's protracted saga reaches back to events predating the first of her seven administrative hearings. The Disability Determination Bureau had sought information from Janet's former employer, the Indiana State Board of Accounts. R. at

220.  Janet's supervisor completed the provided form.  He explained that Janet had been employed there as a "field examiner (auditor)" from March 24, 2003 through April 3, 2007, but she had resigned after missing over 100 days in the last year of employment because of "neck" pain that resulted in surgery.  R. at 217.  He also explained that she did not have problems doing her job when she was there, but he would not rehire her because she was not able to come to work on a consistent basis.  R. at 217-19.

During the hearing, the administrative law judge called an impartial medical expert, Morris Spector, M.D., to testify as to the extent of Janet's limitations based on her physical impairments.  *See* R. 32-35.  Dr. Spector testified that Janet would "really have difficulty doing anything more than sedentary work" based on her combination of impairments: "chronic pain . . . described as fibromyalgia," diabetes, degenerative disc disease, sleep apnea, and morbid obesity.  R. at 35.  On cross-examination, Janet's counsel asked Dr. Spector if the conditions would "be capable of causing pain[] severe enough that somebody would miss work because of [it]?"  R. at 36.  Dr. Spector responded, "That is a common problem, they do miss work quite frequently."  R. at 37.  Counsel asked, "How often do you think these type[s] of conditions would cause pain that would cause somebody to miss work, doctor?"  *Id*.  Dr. Spector testified, "It's hard to say, but probably at least twice a month."  *Id*.

Despite Dr. Spector's testimony, the administrative law judge found that Janet's allegation that she would miss work was not credible.  On judicial review, the Hon. William T. Lawrence of our court cited the relevant evidence that: (1) Janet testified that she was terminated from her last job at Walgreen's because she missed too many days of

work, (2) she missed over 100 days in her last year of employment at her previous job as a field auditor, (3) she was morbidly obese contributing to her experience of chronic pain throughout her body, and (4) Dr. Spector testified that she would probably miss at least two days of work per month.  R. at 688-89.  Judge Lawrence concluded, "Based on [Dr. Spector's] testimony, it was error for the ALJ to find [Janet's] own testimony regarding the amount of time she needed to take of work not to be credible."  R. at 689.

The next administrative law judge to decide the case noted that Judge Lawrence had ordered the Commissioner to "[a]ssess the extent to which any absences from work would impact the claimant's ability to . . . work."  R. at 572.  However, the administrative law judge did not address the statement from Janet's supervisor or Dr. Spector's testimony.  On judicial review of the unfavorable decision, following Janet's brief in support of her complaint, the Commissioner filed a joint motion to remand the case for further administrative proceedings.  R. at 2233.

On remand, the same administrative law judge noted that Judge Lawrence had ordered the SSA to consider the former employer's statements.  R. at 2108.  The administrative law judge explained that Janet had testified she stopped working in 2008 because of attendance issues.  *Id.*  She cited to Janet's reports to the SSA that she was terminated because of production deficits caused by fatigue and absences caused by chronic pain, as well as the statements from her supervisor at the Indiana State Board of Accounts.  *Id.*  The administrative law judge found that Janet's descriptions of her symptoms were "specific and detailed.  Consistently throughout the medical record, the claimant has presented to medical providers with complaints of fatigue."  *Id.* (citations

omitted).  She noted Dr. Spector's testimony[6] agreeing that individuals with fibromyalgia have good and bad days, as well as Janet's consistent testimony in several hearings that she experienced bad days when she could not get out of bed.  R. at 2109.  She explained that "symptoms of fibromyalgia may wax and wane, and that a person suffering from fibromyalgia may be able to do activities on one day that he or she could not do on another day; thus an evaluation of the longitudinal record is in order."  *Id.*  She also explained that Janet had "numerous office visits . . . reflecting regular follow-up visits to the doctor to seek relief from the alleged fibromyalgia symptoms."  *Id.*  She detailed the treatment evidence from a relevant specialist, a rheumatologist, a primary care physician, and later pain management, as well as Janet's complaints of widespread pain throughout her body, the use of several prescribed medications, and trigger point injections.  *Id.*  Despite analysis of the longitudinal record that found only consistency with Janet's relevant allegations, the administrative law judge came to the inapposite conclusion that Janet could sustain a range of sedentary exertional work.  *Id.*  Specifically, the administrative law judge explained:

> As discussed above, the claimant's termination was effective April 3, 2007 (Exhibit 20E).  The claimant's performance appraisal on April 1, 2007 noted issues with an inability to work a full week (Exhibit 20E/25).  This information has limited probative value as the issue is not whether she could do this work but whether there would be other work available nationally or locally.  Thus, little weight is assigned.

---

[6] The administrative law judge did not explicitly weigh Dr. Spector's opinion, nor did she provide a reason why it was rejected.

*Id.*  However, the case was again remanded on judicial review pursuant to the parties'

joint motion.  R. at 3057.

**The ALJ's Decision**

In the decision under review here, the ALJ addressed Dr. Spector's "impartial"

opinion, including that Janet "could 'probably' be expected to miss at least two days of

work per month due to the common symptoms from her impairments."  R. at 2942.

During the hearing, the ALJ asked the VE "what would be the tolerance for absences?"

R. at 3004.  The VE testified, "One day a month after a probationary period of 90 days.

No more than 10 days in a 12-month period."  *Id.*  However, the ALJ did not find that

Janet would need to be absent from work.  Rejecting or discounting the opinion of a

medical expert called by the agency that a claimant is disabled "can be expected to cause

a reviewing court to take notice and await a good explanation for this unusual step."

*Beardsley v. Colvin*, 758 F.3d 834, 839 (7th Cir. 2014) (citations omitted); *see Wilder v.*

*Apfel*, 153 F.3d 799, 801 (7th Cir. 1998) (finding it noteworthy that the disabling opinion

came from the "disinterested expert testimony" of the "agency-appointed expert").

Regarding Dr. Spector's opinion, the ALJ explained:

> This opinion is given some weight.  Although the record does show that the
> claimant should be limited to sedentary work based on her reports of pain
> and fatigue, physical exams and imaging showing deficits, and treatment
> notes showing that her treatment plan changed, the record does not support
> the level of absences opined by Dr. Spector.  While there is evidence that
> the claimant was absent from work prior to her alleged onset date,
> including her testimony at an earlier hearing that she was spending 90
> percent of her time in bed, as well as her subsequent testimony that she was
> bedridden at least 10-15 days every month due to her symptoms, and that
> her fibromyalgia caused her to have "bad days" 70-75% of the time, which
> resulted in her making errors while working, and being terminated from

two jobs due to missing too many days, including missing up to 100 days in her last year of employment. Employment records from her former employer corroborate her testimony about her work history and termination effective April 3, 2007, due to "erratic" attendance and failing to work full time (20E/2, 25). Treatment notes also show that she had issues with attending work due to her fatigue and pain (43F/3).

I note, however, that her termination occurred in 2007, more than a year prior to the alleged onset date and that it is therefore of limited utility in assessing the claimant's condition during the period at issue. During her April 2009 psychological consultative exam, the claimant reported that she "normally" gets up at 1:00 pm and "usually" goes to bed between 10:00 pm and 3:00 am (1F). She also reported going grocery shopping, driving, and walking at least a little outside the home (*id.*). In a February 2010 psychological consultative exam, although she reported having days where she would not get out of bed, she reported getting up around 10:00 am and "usually" going to bed between 10:00 pm to 12:00 [am] (6F). She also reported going grocery shopping and driving (*id.*). In a February 2010 function report, although the claimant reported spending time in bed, she also reported being able to shop in stores for groceries and household items, get together with family and friends to occasionally play board games, and go to doctor appointments (4E). In March 2012, the claimant spent several days in bed, but at the time, she was vomiting from nausea, had constipation, and was prescribed medication (24F/18). In June 2012, she reported going on vacation (16F/37). In December 2013, although she reported sometimes spending several days in bed in a row, her provider noted the claimant was "quite attached" to her opiate regimen (21F/27). In 2015, she reported being unable to go into public some days (32F/5), but this occurred well after the date last insured.

In sum, although the claimant reported instances of being bedridden, this is not consistently reflected in the record, as evidenced by her reporting she normally went to bed in the morning and evening, as well as her undertaking activities like going on vacation, grocery shopping, driving, and visiting family and friends. Nor does the objective medical evidence provide support for a conclusion that she was limited to this degree by her medically determinable impairments. The medical records do not, for example, document instances of the claimant missing or cancelling multiple appointments due to an inability to get up to go her providers' offices. When taken as a whole, the evidence does not support a finding that the claimant would be absent two days per month.

R. at 2942-43.

In the only district court order to reach the merits of the case, Judge Lawrence specifically cited the statement from Janet's supervisor as being relevant to an assessment of the testimony of both Dr. Spector and Janet.  Social Security Ruling ("SSR") 12-2p (S.S.A. July 25, 2012), 2012 WL 3104869, at *4, for *Evaluation of Fibromyalgia*, also explains that:

> Under our regulations and SSR 06-3p, information from nonmedical
> sources can also help us evaluate the severity and functional effects of a
> person's [fibromyalgia].  This information may help us to assess the
> person's ability to function day-to-day and over time.  It may also help us
> when we make findings about the credibility of the person's allegations
> about symptoms and their effects.  Examples of nonmedical sources
> include:
> [. . .]
> b. Past employers[.]

However, the ALJ found the employment records were of limited utility because the attendance issues with the Indiana State Board of Accounts, over 100 absences, occurred in the 12-month period that ended in April 2007, more than a year before Janet's alleged onset date.  In the interim, Janet worked for six months as an accountant for Walgreen's before she was terminated in May 2008—consistent with her alleged onset date—for attendance issues.  R. at 250.  The Seventh Circuit has held that "a claimant's dogged efforts to work beyond her physical capacity would seem to be highly relevant in deciding her credibility and determining whether she is trying to obtain government benefits by exaggerating her pain symptoms."  *Pierce v. Colvin*, 739 F.3d 1046, 1051 (7th Cir. 2014).  If anything, the timeline shows the continuation of a problem that established Janet's onset date.

Moreover, in *Wilder*, the Seventh Circuit explained "[t]he law of the case doctrine, which requires 'the trial court to conform any further proceeding on remand to the principles set forth in the appellate opinion unless there is a compelling reason to depart,' is applicable to judicial review of administrative decisions." 153 F.3d at 803 (quoting *Law v. Medco Research, Inc.*, 113 F.3d 781, 783 (7th Cir. 1997) (additional citation omitted). Whether evidence is sufficient "to support some finding is the type of ruling that establishes the law of the case." 153 F.3d at 803. There, the court determined that the administrative law judge was precluded from finding a medical expert's opinion unsupported by the circumstantial factual evidence because a prior opinion of the Seventh Circuit in that case had previously made the contrary finding concerning the same evidence. *Id*. at 801-03. Here, Judge Lawrence made clear that the existing record—including Janet's testimony about her work ending in 2008 because of attendance issues, as well as the employment records documenting her attendance issues in 2007—supported Dr. Spector's testimony. The ALJ was precluded from reaching the contrary finding that the timing of the same evidence somehow made it of little utility when evaluating Dr. Spector's opinion.

The *Wilder* court explained that "[n]ew evidence can furnish compelling grounds for departure from a previous ruling. But if there is no new evidence, or if, as here, the evidence does not undermine the previous ruling on sufficiency, then that previous ruling must stand." *Id*. at 803 (citations omitted). Despite a now massive administrative record, including six additional hearings, and more than ample opportunity for further development of the relevant issue, little has changed. Several medical experts have

testified but none have seriously challenged Dr. Spector's testimony.  In fact, the next medical expert called to testify about Janet's physical impairments, Ashok Jilhewar, M.D., concluded that they equaled Listing 1.04(A) for disorder of the spine, just before Janet's DLI, when he also considered her congestive heart failure and the intensity of her pain management treatment.  R. at 653-62.  When asked about Janet's likelihood to miss days of work, the next medical expert to testify about her physical impairments, Gilberto Munoz, M.D., gave equivocal testimony, expressing some doubt that it was "typical" of fibromyalgia patients to have bad days, though it was possible, as well as noting that Janet's other conditions could have caused her chronic fatigue complaints.  R. at 2139-43.

Additionally, while the ALJ summarized Janet's testimony earlier in the decision that she attempted to go back to work with two temporary agency jobs in 2017 and was fired for attendance issues, R. at 2935, she neglected to analyze the evidence in the context of Janet's supervisor's statement or Dr. Spector's opinion.  Records from one of the temp agencies reported that Janet missed work during her brief employment in 2017. R. at 2548-49.  On January 4, 2018, during the hearing most contemporaneous to those work attempts, she testified that she had been terminated from both temporary placements because of attendance issues resulting from her fibromyalgia, neck, and shoulder pain.  R. at 2150; 2157.  The more recent evidence shows that Janet's attendance problem was persistent.

The ALJ gave a variety of reasons to depart form Dr. Spector's opinion that Janet would miss days, but none of them are supported by substantial evidence.  Janet's limited daily activities do not contradict her claims of disabling symptoms, including pain, when

they are considered in the context she provided about her need and ability to structure her activities around her symptoms. *See, e.g.*, *Villano*, 556 F.3d at 563. When describing her daily schedule—contemporaneous with the period at issue—to two psychological consultative examiners, first in 2009, Janet did report "normally" getting up at 1:00pm, and "usually" going to be sometime between 10:00pm and 3:00am, but she also reported the need to nap occasionally. R. at 250. In 2010, she specified that even though she got up at 10:00am to eat breakfast and take her medicine and went to bed sometime between 10:00pm and 12:00am at night, she went back to bed during the interim until her husband got home from work and they would have dinner together in the evening. R. at 356.

There was one mention of Janet taking a vacation, when she was with her husband and involved a motor vehicle accident that exacerbated her back pain. R. at 1081. However, the record does not disclose what Janet did on the vacation, how far she traveled, or how well she managed the travel. The Seventh Circuit has explained that these details matter because a relaxing vacation on a beach might be consistent with disabling complaints. *See, e.g.*, *Murphy v. Colvin*, 759 F.3d 811, 817 (7th Cir. 2014), *as amended* (Aug. 20, 2014). The sole reference to a vacation does not undermine Janet's allegation that she had bad days.

The ALJ cited several instances during the period at issue of Janet reporting to treating providers that she was bedridden for multiple days at a time. The ALJ implied these complaints were caused by acute symptoms distinct from Janet's relevant, chronic complaints. The ALJ expressly concluded that the complaints were not consistent enough. However, the ALJ neglected that Janet reported to her primary care doctor in

14

May 2009 that she felt exhausted even after sleeping for two days.  R. at 259.  Moreover, the ALJ dismissed Janet's reports just before her DLI that she had severe pain and that the pain "causes severe fatigue placing her in bed sometimes 2-3 days in a row."  R. at 1393. The ALJ's explanation that Janet was noted to be quite attached to her opiate pain medication at the time is not inconsistent with her complaints of disabling pain.

The ALJ also relied on Janet's ability to make it to her doctor's appointments as evidence that she would have been able to sustain a full-time work schedule.  In *Mirsada I. v. Saul*, 2020 WL 4437828, at *4 n.7 (N.D. Ill. Aug. 3, 2020), concerning testimony that the claimant did not miss doctor's appointments, the court explained:

> This fact was offered to support the inference that if plaintiff were able to consistently show up for doctor appointments, she could also consistently show up for work.  Counter[]arguments could be raised about this inference.  A person who was suffering from symptoms might be more willing to fight through the difficulties to see a doctor on the hope that the doctor might relieve those symptoms.  Also, a doctor's visit is typically much shorter than a full 8-hour workday.

We find the explanation in *Mirsada I.* persuasive that the ability to attend doctor appointments is not substantial evidence that Janet did not have bad days that would cause work absences as regularly as at least twice a month.

None of the evidence relied on by the ALJ provides a compelling reason to depart from Judge Lawrence's conclusion that the record was consistent with Janet's allegation that she would have missed work.  More specifically, none of the evidence supports the ALJ taking the unusual sidestep to avoid the relevant, disabling aspect of Dr. Spector's opinion.

**<u>Disposition</u>**

As in *Wilder*, after all is said and done, the only disabling testimony is that of a medical expert which is supported by the record.  153 F.3d at 803.  Despite the extensive record compiled and under review here, "the case is exactly where it was the last time: with no reasoned basis for the denial of benefits."  *Id*. at 804.  The Administrative Agency has (again) failed to develop a basis in the record to support its conclusions regarding the denial of disability based on whether Janet would miss days of work, and has completely ignored the evidence relied upon and cited by Judge Lawrence in his remand order.  Twice the Commissioner voluntarily acknowledged that Janet's petitions for judicial review were sufficiently well taken to warrant stipulated remands prior to the court offering any rulings as to the merits of her claims.  Even so, the ALJ has once again withheld a finding as to the sufficiency of the record that would allow a determination, based on Janet's work attendance record and Dr. Spector's supportive opinion, that she is entitled to benefits.  Borrowing Judge Posner's characterization of such a refusal to acknowledge the obvious as "obduracy," we find such an unjustified result to justify that characterization.  We hold that the record before us is legally and factually sufficient to warrant our taking the unusual step of remanding this case to the agency with instructions that the application for benefits be granted.  *Id.*  Accordingly, Janet's petition for judicial review is granted, the ALJ's decision denying benefits shall be reversed, and this case shall be remanded to the SSA to award benefits in her favor consistent with her legal entitlement thereto.

16

## Conclusion and Order

For the reasons explained above, the ALJ's decision is REVERSED and the case is

REMANDED for disposition consistent with this order under sentence four of 42 U.S.C.

§ 404(g).  Final judgment shall issue by separate order.  Fed. R. Civ. P. 58(a).

IT IS SO ORDERED.

Date:    8/31/2021

SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

Distribution:

Frederick J. Daley, Jr.
DALEY DISABILITY LAW P.C.
fdaley@fdaleylaw.com

Lu Han
SOCIAL SECURITY ADMINISTRATION
lu.han@ssa.gov

Meredith E. Marcus
DALEY DISABILITY LAW, PC
mmarcus@fdaleylaw.com

Julian Clifford Wierenga
UNITED STATES ATTORNEY'S OFFICE (Indianapolis)
julian.wierenga@usdoj.gov